W. W. Lawrence v. The State.

No. 2458.     Decided May 21, 1913.

**Murder—Charge of Court—Temporary Insanity—Article 41, Penal Code.**

Where, upon trial of murder, the evidence tended to show the temporary insanity of defendant at the time of the homicide, brought about by the immoderate recent use of intoxicating liquors, the court should have charged on this phase of the evidence under article 41, Penal Code, and an instruction that the use of intoxicating liquors is not an excuse for crime, etc., ignoring the other portion of said article, was reversible error; and this, although defendant was convicted only of murder in the second degree.

Appeal from the District Court of Brazoria. Tried below before the Hon. C. W. Robinson, presiding in exchange.

Appeal from a conviction of murder in the second degree; penalty, forty-one years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Munson* and *Masterson & Bucks*, for appellant.—On question of temporary insanity by the use of intoxicating liquors: Lawrence v. State, 65 Texas Crim. Rep., 93, 143 S. W. Rep., 636; Hierholzer v. State, 83 S. W. Rep., 836; Miller v. State, 105 S. W. Rep., 502; Edwards v. State, 54 S. W. Rep., 589.

*C. E. Lane*, Assistant Attorney-General, and *R. R. Lewis* and *C. A. Sweeton*, for the State..—On question of court's charge on insanity by use of intoxicating liquors: Griffith v. State, 78 S. W. Rep., 347; Menach v. State, 97 S. W. Rep., 503; Lucas v. State, recently decided.

HARPER, JUDGE.—This is the second appeal in this case, the opinion in the former appeal being reported in 63 Texas Crim. Rep., 93, 143 S. W. Rep., 636. In that opinion we held that the evidence on that trial called for a charge on temporary insanity produced by the recent use of ardent spirits, and also a charge on temporary insanity produced by the recent use of intoxicating liquors and drugs combined. The able trial judge who presided over the trial held to a different view and refused to submit either issue to the jury, and so strong was his conviction in the premises instead of submitting those issues he instructed the jury: "I instruct you that intoxication produced by the voluntary and recent use of ardent spirits will constitute no excuse in this State for a commission of crime, nor shall it mitigate the degree of the crime (if any), nor shall it mitigate the penalty of the crime committed (if any)." The court, giving this charge, evidently was of the opinion that the evidence showed that appellant was intoxicated, and we do not think any two minds can arrive at a different conclusion after reading this record, but he did not think the evidence raised the issue to that extent of rendering appellant incapable of knowing right from wrong, that is, it did not produce a mental aberration to the extent of rendering him temporarily insane. It may and should be conceded that evidence offered in behalf of the State would support a finding by the jury that appellant was sane and knew right from wrong at the time he killed Buchheit, but that is not the question here to be decided; the question before us is, did the testimony offered in his behalf raise the issue that he may have been at that time so under the influence of intoxicants as to so affect him mentally as to produce a temporary mental condition which rendered him incapable of appreciating and knowing what he was doing at the time he shot and killed the deceased. We have, on more than one occasion, read the testimony, and can come to no other conclusion than that it raised that issue with such strength and cogency as to require its submission to the jury.

Beginning with the night before, when appellant was in Houston, Charlie Smith testified he met appellant between 10 and 11 o'clock in the reservation. "I was standing on the corner when he came along by himself very much intoxicated. He was so drunk that he did not know me till I told him who I was. We were together from that time until the next morning at 9 o'clock. When I met him he said, 'You are the very damn fellow I want to see.' He had a bottle of whisky and we commenced drinking out of it. We drank the whole quart, and then went into a house and began drinking beer. We stayed in this house till daylight the next morning. When I met him he had a quart bottle of whisky. It was not quite full, a little gone out of it. He and I drank it all. We found this fellow Thompkins in the house and Lawrence introduced me to him. We emptied the bottle before we met Thompkins. We drank a good deal of beer, but do not remember just how much. We stayed there till about daylight. Lawrence was very drunk, and could hardly stand. Talked at random, cursed me out as

well as everyone else. The landlady took us upstairs and put us in a room where there was a bed and a couch. Lawrence lay across the bed and I lay on the couch. Directly he got to cutting up—got crazy—walked around the bed, catching hold of everything and trying to pull the bed apart. I can't repeat what he said,—he was talking out of his mind; then a woman came in and asked what was the matter with him, and she says, 'I will quiet him,' and she pulled up his sleeve and gave him a hypo; that quieted him for a while. This occurred about 4 o'clock or somewhere like that time. Did not drink any more beer that night. Stayed there till about daylight, then left for town. Went to Davis' saloon just outside the reservation and took several drinks, then caught a car and went down in town to Dubard's saloon, where Lawrence had left some money, and he got his money and we took eight or ten drinks of whisky. Think we got there about 7 o'clock, and don't know how long we stayed. He sent Thompkins to the depot with some package and we got on the car and went back to the reservation to the same house. When we got there he got to cutting up again and the same woman gave him another hypo. That was about half past eight. I got him away after we had drunk one or two bottles of beer. I told him if he was going to catch that train that he would have to hurry. We went back to Dubard's saloon and I got him on the car and he cursed me because I would not go with him. I put him on a car that would take him to the Central depot. He was just as drunk as a man could get, and his mental faculties were not right as he was cursing me for everything he could think of and wanted to fight everybody. I have known him for eight or ten years and when he drinks he becomes wild and unmanageable and will fight and abuse his best friend. I have seen him crazy drunk in Batson."

A number of witnesses testified as to appellant's condition in Houston and they corroborate Smith. W. J. Thompkins, after testifying as to appellant's condition in Houston, testified that when he got to the Grand Central depot in Houston the next morning he was pretty drunk, and did not recognize him at first. That he pushed appellant on the train, and then adds: "We went into the train, took a bottle of whisky, went to the closet and opened the whisky and each of us took a drink; we drank quite a number of drinks between Houston and Bay City. No one else drank with us; we emptied one quart bottle and had opened the second one and drunk a good deal of it. I don't know just how much was left in the second quart bottle when we got to Bay City. I had kinder forgotten where I was going when I reached there. I was arrested at Bay City and taken off the train by the marshal for drinking whisky on the train. I was pretty full myself and Lawrence was pretty full. We had drunk one whole quart of whisky and a right smart out of the second bottle when we reached Bay City and I was taken off the train." Appellant remained on the train until it arrived at his home in Markham, when his wife, Mrs. W. W. Lawrence, testified that shortly after the train arrived (between 2 and 3 o'clock) she saw her husband stand-

ing by the corner of the rice mill acting like someone that was crazy; that she and her children went after him and carried him home and put him to bed; that he would jump up and down and acted like he did once before when he was crazy from whisky, and his eyes were jumping in his head. That after a while he went to sleep. A drayman brought nine quarts of whisky to the house. About 4 o'clock Jim Ryan came and woke appellant up (over her protest). The record does not disclose that prior to this visit of Jim Ryan appellant ever had any ill-will towards deceased, Buchheit, but had him in his employ as a trusted employe and had left his business in Buchheit's hands when he went to Houston. The record further discloses that Ryan desired Buchheit's position and reported matters about Buchheit to appellant, and persuaded appellant to go to town, and then the telephone message occurs upon which the State relied to show motive, etc., in this case. Appellant returned home from town about 6 o'clock and requested his wife to get supper ready, but that after she prepared supper he did not eat anything, saying repeatedly, while supper was before him, "Why don't you get supper ready?" That he poured whisky in his coffee and drank it, eating nothing. She shows he was in this condition when he left home, saying that appellant, Ryan and Thompkins, who had arrived from Bay City, drank about one and one-half quarts of whisky between 5 and 7 o'clock that evening. Ryan being indicted for this same offense, did not testify. Thompkins testified that he, Ryan and appellant started to the oil field in one buggy. That before driving far they met Alvin Lawrence, who called to him to get in the buggy with him, and says: "While we were making the exchange Bill Lawrence took another drink. We then drove on to the store and stopped again, and there we took a couple of drinks around. We next stopped at the drilling rig. Alvin and I got out and went up to the derrick, but Bill Lawrence and Jim Ryan stayed in the buggy in which they were in. Bill Vandeveer went out to where they were and got in the buggy with Ryan and Lawrence; at that time Will Lawrence was pretty drunk; the balance of us that went out there with him were pretty well jagged, too." Alvin Lawrence testified on this trial that he was a brother of appellant, and corroborated the above testimony of Thompkins, and that at this time his brother did not know what he was doing, and left with Ryan in a buggy. In a few minutes Buchheit was killed by Lawrence.

Dr. Baxter Smith, a regular practicing physician, qualified as an expert, and in answer to a hypothetical question testified: "In the first place it would depend on how much whisky this man had been taking and what the peculiarities of his constitution were, and if he was in the state of beastly intoxication and these drugs were injected into him, it would floor him altogether, and he would have no mind at all, and if it was cocaine it would be very apt to kill him. If he was in the state of beastly intoxication, and those drugs were injected on top of it, that would knock him out altogether. The effects of opium lasts from twelve

to eighteen hours as a general thing. Cocaine sometimes takes several days to get over, that is, if you get over it at all."

Many witnesses testified; some of them had known appellant for years, and said when he got on these periodical sprees, they had seen him in that condition and "he then looked and acted like a crazy man," citing what he did on those occasions. Witnesses testify that almost immediately after the killing they met appellant and Ryan, and when appellant was left alone he went sound asleep. The deputy who arrested him that night says he drove him back to the house where the homicide occurred, and when he went in he left appellant in an automobile, and when he returned appellant was again asleep.

Article 41 of the Penal Code provides: "Neither intoxication nor temporary insanity of mind, produced by the voluntary recent use of ardent spirits, shall constitute any excuse in this State for the commission of crime, nor shall intoxication mitigate either the degree or the penalty of crime, but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried, and in cases of murder for the purpose of determining the degree of murder of which the defendant may be found guilty. It shall be the duty of the several district and county judges of this State, in any criminal prosecution pending before them, where temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was brought about by the immoderate use of intoxicating liquors, to charge the jury in accordance with the provisions of this article." It is thus seen it is made the duty of the judge trying a criminal case, when the evidence *tends to show* temporary insanity brought about by the immoderate use of intoxicating liquors, to give this article in charge to the jury, and under every decision rendered by this court since the enactment of the above article testimony of the above force and cogency has been held sufficient to raise this issue. We are not discussing, as hereinbefore stated, whether the evidence offered in behalf of the State would support a finding that he was sane. We are of the opinion it will, but every one on trial has the right to have the issues submitted from the standpoint of the defendant as well as from the standpoint of the State, and we are unable to see how anyone could conclude that the above testimony does not tend to raise the issue that appellant at the time was in that mental condition from the use of intoxicants as to require a submission of that issue under the plain letter of the above statute. Another contention of the State is, that if that issue should have been submitted by the court, that a failure to do so would not present reversible error, as appellant was convicted only of murder in the second degree. In cases of murder this statute provides in plain terms that temporary unsoundness of mind applies both to the degree of murder, and in mitigation of the punishment of whatever degree he may be found guilty. We do not deem it

necessary to discuss this last question further as after next July we will have no degrees in murder.

The other questions herein presented need not be reviewed as they will not probably occur on another trial, but for the error of the court in that portion of his charge hereinbefore copied which took away from him his sole defense, and in refusing to submit the issues as directed in the former opinion of this court in this case, the judgment will be reversed and the cause remanded for another trial, and we trust the trial court will follow the instructions of this court and not put the State to the expense of more than one more trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*